**P. S. FISH INDUSTRIES, INC.**

v.

**ST. GEORGE PACKING COMPANY, Inc., and the FISHING VESSEL LAURA AND GLENN, her engines, tackle, apparel, etc.**

**Civ. A. No. 68–B–71.**

United States District Court
S. D. Texas,
Brownsville Division.
July 11, 1969.

Storter, Carinhas & Cunningham, Jack G. Carinhas, Jr., Brownsville, Tex., for plaintiff.

Adams, Graham, Lewis & Graham, Gordon L. Briscoe, Harlingen, Tex., for defendant.

## MEMORANDUM

GARZA, District Judge.

This cause arose out of the collision of two fishing vessels during the early afternoon of October 18, 1967, in the Gulf of Mexico off the South Texas Coast some twenty to twenty-five miles east of Brazos Santiago Pass which is the entrance from the Gulf to the Ports of Port Isabel, Texas, and Brownsville, Texas.

The case was tried by the Court on June 4, 1969, and the parties were allowed an opportunity to present briefs.

The case is now before the Court for decision..

P. S. Fishing Industries, Inc., a corporation organized and existing under the laws of the State of New York and doing business within this District, is the owner and operator of the F/V HI-DOC, a 68-foot wood hull double-rigged shrimp trawler. It brought this suit for damages against the Defendants both in rem against the F/V LAURA & GLENN, and its owner, St. George Packing Company, Inc., a Florida corporation doing business in this District in personam. The F/V LAURA & GLENN was a rather new 73-foot wood hull double-rigged shrimp trawler under the command of Matthew J. Stranowicz.

The F/V HI-DOC was on a shrimping trip in the Gulf of Mexico, and had been out some two or three days when in the early afternoon of October 18, 1967, it was in collision with the F/V LAURA & GLENN.

The F/V HI-DOC had a 3-man crew on board, consisting of Oscar Robinson as Captain, whose testimony has been presented to the Court through his deposition, Emery Brown as rigman or "striker", who testified in person during the trial of this cause; and one Dominic Sole who was on board as a header. He apparently was one of Plaintiff's shareholders who had recently joined the ves-

sel for the trip. Apparently Sole got seasick and was in his bunk aft of the pilothouse before and at the time of the collision. Both Robinson and Brown had long experience on shrimp vessels and were experienced commercial fishermen. The HI-DOC was a seaworthy vessel in good working condition.

Apparently there had been a good run of shrimp in the area of the collision, and a large fleet of shrimp vessels, some fifty or sixty, had been working in the area. During their drags, the shrimping vessels on many occasions had to pass close to each other, and many of the shrimping vessels had passed as close as thirty feet from the HI-DOC before the collision.

Sometime between 12:00 noon and 1:00 p. m. on October 18th, the HI-DOC was trawling or dragging on an East-Northeast course in twenty-six fathoms of water with both rigs and her try-net overboard. The HI-DOC was making a speed of about two or three knots per hour. The weather conditions were favorable with light winds and calm seas. Visibility was good. The header, Sole, was in his bunk, as has been noted above. The Master of the HI-DOC, Robinson, was at the helm of his boat, and Brown, the rigman, was on the stern of the boat heading shrimp from a prior drag.

Robinson has testified, and I find it to be a fact, that the first time that he saw the LAURA & GLENN she was a long distance ahead of the HI-DOC in or near a bunch of other boats. The LAURA & GLENN, which was also dragging for shrimp, was approaching off the HI-DOC's port bow. Her master, Stranowicz, has testified in court that she was navigating at a speed of some five to six miles per hour on a Southwest course by automatic pilot with no one on watch in her pilothouse at the time of the collision and for some twenty minutes before the collision. Apparently the members of the crew of the LAURA & GLENN were at the vessel's stern heading shrimp and cleaning the deck from the previous drag.

Robinson has testified that he continued to observe the LAURA & GLENN as she drew closer to the HI-DOC, but he at all times considered she had room to pass on the port side and was not concerned, as other vessels had passed the HI-DOC close aboard from time to time during the day. When the LAURA & GLENN got within twenty to thirty yards of the HI-DOC's port side, Robinson first realized that danger of collision existed, and he immediately turned HI-DOC's wheel hard to starboard in a desperate effort to avoid collision.

As the LAURA & GLENN bore down on the HI-DOC's port side, Robinson noticed that no one was in her pilothouse and he started shouting to the LAURA & GLENN to "roll off".

Emery Brown, the rigman on board the HI-DOC, has testified that while he was heading shrimp at the stern of the HI-DOC on the starboard side, he first observed LAURA & GLENN's port outrigger extending across the HI-DOC's bow a short distance away; that he immediately got up and ran along the starboard side alleyway to the HI-DOC's pilothouse, where he found Robinson turning HI-DOC's wheel hard starboard, and at the same time pulling the throttle back to reduce the speed; that he, seeing the collision about to happen, disengaged the clutch control and placed the HI-DOC's engine in reverse; that he also shouted to the LAURA & GLENN to "roll off", but that the collision occurred.

One of the disputed issues is whether the meeting of the HI-DOC and the LAURA & GLENN was a head-on meeting or nearly so, or whether the vessels were in a crossing situation.

■ From the evidence before the Court, including the pictures showing the damage to the HI-DOC, and from what Robinson has testified, there is no question that the LAURA & GLENN's bow collided heavily with the port forward quarter of the HI-DOC some ten feet aft of her bow.

The evidence is clear that prior to and at the time of the collision the vessels were in a crossing situation in which the HI-DOC, proceeding on an East-Northeast course, was on the starboard side of the LAURA & GLENN and was, therefore, the privileged vessel, and it was the duty of the LAURA & GLENN to stay clear of the HI-DOC under the Starboard Hand Rule, Rule 19 of the International Rules, 33 U.S.C. § 1081.

At the conclusion of the evidence, this Court indicated that both vessels were at fault. However, a review of the evidence has proved differently.

 I find from the evidence before me that the LAURA & GLENN was negligent in failing to keep a proper lookout, and in fact in having no lookout at all, under the facts existing in that area of the Gulf at the time of the collision; and that this failure to keep a proper lookout was the sole proximate cause of the collision and of the damages caused to the HI-DOC.

Neither vessel blew a whistle. The Defendants are trying to saddle the Plaintiff here with half of the damages, claiming that this failure to give a signal, and the failure of Robinson to try to avoid the collision before he did, made the HI-DOC equally responsible for this collision.

 The HI-DOC and its Master had a right to believe that the LAURA & GLENN would observe the starboard hand rule under the circumstances, and he did everything that was possible to do after he realized that the LAURA & GLENN would not give way as she should have.

 The failure to blow a signal, I find under the circumstances, did not have anything to do with the collision, nor could it have avoided the collision since no one was at the pilothouse of the LAURA & GLENN that could have done anything about it. If it could be said by any stretch of the imagination, that the HI-DOC was guilty of any fault, it certainly was a minor one, and under the Major-Minor Fault Rule, the major fault being on the LAURA & GLENN, it must bear all of the damages.

After the initial impact, the LAURA & GLENN's anchor davit extending from her bow continued to rake against the port side of HI-DOC almost to her stern. The impact and the outrigger of the LAURA & GLENN caused the HI-DOC severe extensive damage which consisted of tearing away of the bulwarks, port and starboard; mast, boom, outriggers and all running rigging torn down; mast trunk in engine room damaged; stakes pulled away from bulwarks; winch damaged; both trawl cables, doors and nets lost; hull loosened; ship-to-shore radio telephone and antenna damaged.

The LAURA & GLENN suffered no damage in the collision beyond some scraped paint on her bow.

After the collision another nearby vessel and the LAURA & GLENN reported the collision to the Coast Guard and after all loose wires and rigging were secured to HI-DOC's deck, the HI-DOC limped into Port Isabel at half speed under escort of the LAURA & GLENN, to a point offshore of the jetties where she was met by the Coast Guard.

After its arrival at Port Isabel, the HI-DOC was surveyed afloat by Marine Surveyor Manning Dierlam on October 23, 1967, and thereafter was also surveyed by the LAURA & GLENN surveyor. Both estimates of damage proved later to be very low.

Because of the striking of Hurricane BEULAH in this area on September 20, 1967, all local shipyards were extremely busy, and it was determined that several months would go by before they could get time to make the repairs on the HI-DOC. So it was decided, under the direction of Surveyor Dierlam, that the HI-DOC, after undergoing temporary repairs at Port Isabel, would go to Ft. Myers, Florida, where a competent repair facility was available to perform permanent repairs without delay.

The HI-DOC left this area for Ft. Myers, Florida with the vessel LITTLE

JOE accompanying it in the event any trouble developed. While enroute to Freeport, Texas, on its way to Florida, the HI-DOC went aground in mud in the Intracoastal Canal, but after undergoing minor repairs to her rudder and rudder shoe at Aransas Pass, Texas, it continued on its way to Freeport, and then to Florida, and arrived at Ft. Myers, Florida on December 4, 1967, when she was placed on the railway of Diesel Corporation for inspection and repair. The permanent repairs were completed on February 8, 1968, and the HI-DOC returned to shrimping on February 15, 1968.

The temporary repairs at Port Isabel were $682.45; and the permanent repairs at Ft. Myers, Florida, were $13,667.43, but from the evidence before me I find that $2,754.00 of this amount involved betterment of the vessel and the cost of repairs for which the LAURA & GLENN is responsible in Florida should be reduced by this amount.

While enroute to Florida it became necessary for the HI-DOC to purchase a marine radio to replace the one which had been damaged by the collision. The cost of this marine radio was $969.00, but I find that there was a betterment of the marine radio that had been damaged in the sum of $319.00, leaving the sum of $650.00 as damages caused to the marine radio by the collision.

In taking the vessel to Florida to minimize the damages, I find that the Plaintiff spent $550.00 for wages, $240.00 for fuel, $250.00 for grocery expense, and the escort fee of the LITTLE JOE in the sum of $1,000.00, or a total of $2,040.00.

Evidence was presented to the Court on the issue of loss of use and earnings. From the evidence before me, I find that the loss of use and earnings of the HI-DOC while it was being repaired amounted to $6,079.59.

The Court is denying the survey fee claimed by the Plaintiff and the owner's time in attendance on repairs of the vessel.

Interest will be allowed only from the entry of judgment in this cause.

Since I have found that the sole proximate cause of the collision in question was the failure of the LAURA & GLENN to keep a proper lookout, damages as outlined above will be ordered paid to the Plaintiff.

Counsel for the Plaintiff will prepare an appropriate judgment in accordance with these, the Court's Findings of Fact and Conclusions of Law.

The Clerk will send copies of this Memorandum to counsel for the parties.